This case does not involve such a severe penalty. It involves a penalty of $150. Yes, and the loss of a job. How much money is this going to cost the government to fight over this case? There have been three government attorneys. There have been three court-appointed defense attorneys. Mr. Jackson lost his job over this. He lost his security clearance, and he's hardly able to support his family. All this for a case in which Mr. Jackson was not guilty as a matter of law of violating 18 U.S.C. Section 701. I mean, this is a very unusual sort of sufficiency case because it's pretty much as close as you can get to a pure issue of law. And that's because, unlike most sufficiency cases, the magistrate judge in this case entered findings of fact. He made 11 findings of fact that he found were proved beyond a reasonable doubt. So the Court can proceed straight to what it's described in Nevels as the second step, which is whether, as a matter of law, the evidence that the magistrate judge found proved beyond a reasonable doubt supported the conviction. And the answer to that question is no. The magistrate court found as follows. Sometime before March 2, 2011, Ms. Ashcroft and Ms. Ford refused to make Mr. Jackson a yellow card because he didn't have a CAT card. On March 2, Carmen Guajardo made Mr. Jackson a CAT card with the wrong expiration date. On that same day, Mr. Jackson went to Manpower to get his yellow card. The magistrate didn't make any findings as to what happened in Manpower, but there's really only two options. One, that Mr. Jackson went in there. When they asked him for his CAT card, which he now had, he said, I don't have one, and was denied again. Or that when they asked him for his CAT card, he gave them the CAT card, they made him a yellow card, and he left Manpower with the yellow card that he then showed his two coworkers, Mr. Perez and Mr. Davis. But even if we wanted to say, okay, it's a possibility that when he went into Manpower, he sabotaged his ability to get a yellow card by denying he had a CAT card, we would still have to explain the magistrate judge's further finding of fact. Both Mr. Davis and Mr. Perez distinctly recalled, and this is unimpeached, undisputed, and it's one of the magistrate judge's findings of fact. They distinctly recalled Mr. Jackson going into Manpower, which was separated from the paint shop by a door, being there for 30 to 45 minutes, and coming back with a yellow card. So to believe the government's versions of events, not only would Mr. Jackson have to have made this yellow card, and it's not clear at all how he could have made it, but he would have had to also have gone into Manpower at some point in early March, hung out for 30 to 45 minutes, and come back with this yellow card. Well, just speaking for myself and nobody else, you know, I think you have a harder burden when you're talking about factual findings, which may not be very persuasive or dramatic, than you are about legal issues. I don't want to prejudge this case before hearing the arguments, although it seems pretty clear to me the statute doesn't cover this offense. Don't you think it would be a good idea to talk about the legal issues here? I'm certainly happy to do that, Your Honor. I'm sure you understand that we always have clients in these cases, and the clients who are innocent want to have their story heard, but it's precisely because of the legal issues that we're seeing that we're having to be very careful not to overstate  And I think that's the story here. I mean, why was he getting so many badges? What was happening here? There really weren't that many badges that he got. He lost three badges. The third badge that he lost was the one that was issued on March 23rd. So he kept losing badges? He lost two badges before that.  The real question, though, is why they prosecuted this case, because he clearly was carrying this badge for several weeks. And it's only implicit and latent in the record, but he had filed EEOC grievance for racial discrimination against the base. And it was two days before he was pulled over and asked about his yellow card that his formal complaint was received by the Marine Personnel Office. It's latent in the record because we have the security guard who tells him to stop crying like a B word and to take it like a man. And he says the reason he... Like a bitch. Yes. He said stop. He said that. That's not the B word yet. You know, when I say it at home, I say it, but in the courtroom I thought I would just say the B word. So he tells him that. And the reason he says he tells him that was because Mr. Jackson was saying, you're harassing me like everyone else. Everyone here is harassing me. So he's carrying this yellow card for three weeks, and then suddenly they pull him over and say it's not a valid yellow card. Okay. Setting aside for the question, the factual question, which I actually don't think is really factual in this case because the magistrate judge actually entered findings of fact, but let's turn to the legal question, and I think that they're intimately tied. But just the factual question, I do have it. I know you want to get to the law, but it seems like the testimony showed that Jackson had a yellow badge that markedly different from the other employee badges. Is that true? It was somewhat different. I wouldn't say it was markedly different. Yes, it is somewhat different. The testimony also showed that the two people authorized to make the badges, yellow badges, did not make his badge. So why is that not enough evidence to find that Mr. Jackson manufactured or possessed a colorable imitation of a yellow badge, even if there are some pieces of unexplained evidence? Because under Nevels, when you get to the second step, you have to weigh the evidence of guilt against the evidence of innocence. And there is absolutely no explanation that is consistent with all the facts that the judge found. But the judge, and here, you know, made some credibility findings. Is Judge Parada, is that who it was? Yes. And just can we review the credibility findings? Sure. I mean, that Judge Parada made, or would we in this instances? Because unless we can, it seems like there might be sufficient evidence to affirm the conviction if the law is correct. The credibility findings come at the very end of his decision. He first enters 11 findings of fact. And among those findings of fact are the fact that Ms. Ashcroft and Ms. Ford refused to make a yellow card before March 2, 2011, and that the only reason they gave was that he did not have a CAC card. So that is one finding of fact. Another finding of fact is that on March 2011, he obtained a CAC card. And a third finding of fact is on March 2011, 3rd, 2011, when he already had a CAC card, he went to Nancower to get a yellow card. These are all findings of fact. Now, you've used almost eight minutes out of your ten. Your arguments are good on your legal issues. I kind of agree with what I suspect Judge McGee is saying, that they're not so good on the factual issues. But we're going to have no time to hear your legal issues if you don't do what I asked about five minutes ago. I'm sorry, Your Honor. Well, it wasn't your fault, but I would like to hear an argument on the legal issues. Well, it's precisely because there are no regulations that govern these yellow cards that we are so confused as to why and how and when this yellow card was made. There's one correction in the factual record that I think is very crucial here, and I wanted to bring it to the Court's attention because I didn't in my brief, and that is the judge's finding that Exhibit C, which is the blue card in this case, was a CAC card. And the reason why that fact is crucial is because on this base, it's the CAC card that is the official card. It's white. It has a SIM card inside it. There's records that are kept about it. When Ms. Wahardo was questioned, she could tell you every day that she had to issue a CAC card because there are records. There's logs, et cetera. There is no recordkeeping of the yellow card. There are no logs. There are no regulations. Ms. Ashbrook says you always have to take a new picture. Ms. Ford says you always have to take a new picture. I just tell you, you have one minute left for rebuttal. And if you want to have rebuttal at all, you better sit down now, and then you're not going to have discussed the issues you should have been discussing when you started this argument. All right. Thank you. Now, maybe you'll discuss the legal issues in this case. You may have pleased the Court. Cheryl O'Connor on behalf of the United States. And I do want to discuss both the legal and the factual issues because I believe that I'm going to start with the legal issues. I'm going to tell you, I am voting to acquit and to reverse because it is clear to me the statute does not cover this event. Well, thank you, Your Honor. You can give up on one. You've still got two others. I would like to have the opportunity to address the Court's concerns. I think that if we view the evidence as we must in the light most favorable to the government, it establishes each of the elements of the offense here, including that this was a caught, that the yellow card is covered by Section 701 as a means of an identification designed or prescribed by the head of an agency of the United States for use by its employees. The agency involved here, as the district court found, and I want to back up and say the likely reason that there are no particular findings on this point or detailed findings on this point by the magistrate judge is that it wasn't briefed or raised until the post-trial motions after the magistrate judge had issued its decision. So where we really begin to develop this issue in the record are in the post-trial motions and in the district court's affirmation of the magistrate judge's finding. And in looking to whether the maintenance center is an agency or not, we should look to Section Title 18, United States Code, Section 6, which has a very broad definition, a non-exhaustive definition as found by this Court under a similar statute, Section 28, Section 451 in the Acorn case. It includes a litany of examples of what is an agency of the United States, but viewed as a whole, it's essentially an effort to describe any subdivision of the Federal Government as opposed to nongovernmental entities. So what's the agency here? So the agency here is the maintenance center, which is the base within the base that the defendant worked at and for which you needed the second card, the yellow card. And who is the head of that so-called agency? Of the maintenance center. Of the maintenance center. The record indicates that there is a separate colonel who is in charge of the maintenance center as opposed to the colonel who is in charge of the overall base. Yes. And that person is what we can reasonably infer that Carmen Sanchez was referring to, the union representative, who talked about the development of the badges. And what did he say that leads you to believe that Colonel Sanchez prescribed the insignia or design or the badge or the identification card? That the design of that card was prescribed by Colonel Sanchez? Let me clarify. Sanchez is the head of the labor union, the labor organization. All right. Who's the head of the maintenance? And let me acknowledge, Your Honor, that the record, admittedly, the record is not well developed on these points. And I admit that the government may have an uphill battle here. But I'll tell you what the record does show, and I believe that it's sufficient. Two things it shows. It says one, one witness, Mr. Amador, said that the maintenance center came up with the badges. That's one piece of evidence. The other is that the union representative said, we discussed this with management. That's correct. And I think a reasonable inference is that the management that they're referring to who came up with the badge and with whom the union negotiated even whether or not there would be a badge has to be the management, has to be the head, the colonel of the maintenance center. All right. Let's assume, which I don't agree with, that this sub of sub of the maintenance center is a government agency. What is this sub of sub called? No. The maintenance center is the base within the base. The larger base is the Marine Corps Logistics Base. So you concede that the Marine Corps Logistics Base is not the agency within this scenario? I believe that's correct, Your Honor. So then we're looking at the maintenance center and that someone that's head of the maintenance center. You're saying the maintenance center is the agency. I think there's some controversy and dispute about that, and that may be debatable. But let's just say it is. Which head of the maintenance center approved, which is, I think, I can't remember the language, but designed or approved. Designed or prescribed. Yes. That's the element that you need to really focus on. It's not designed or prescribed. It says the design prescribed by the head of the agency. The head of the agency. I apologize, Your Honor. That's exactly correct. So let's just go right to that. And the – that has to be a reasonable inference from the limited evidence has to be that by – that's the management that the union negotiated with. So you should be able to point right to the record to show me where you proved that at the trial here in this case. That is in Sanchez's testimony. The union representative? The union representative. And that is at page 174. So you think you established that element at page 174 of Sanchez's testimony. Can you read me the part that you think fulfills that element? Do you agree if you can't support that element, this case can't go forward? I believe that's correct, Your Honor. So then let's focus, because this is – I mean, we should have a drum roll here, because this is very – Well, and unfortunately, the testimony is slightly meandering on this point. But Sanchez testifies about the badge.  The badge, it was strictly for identification. The whole idea was to identify people that are supposed to be on the compound at the maintenance center, at the MCB, which is the maintenance center. We discussed this with, you know, with management of what this was supposed to be. And then there's a digression. What it was supposed to be for. What this was supposed to be for. And then on page 175, she's – the witness says, at the time when we were talking about that, actually when it was first developed, that's some of the talks that we had. So she's engaging in a negotiation with the management that is developing. But she said we had. Who is she talking about with we? I believe the witness is speaking on behalf of the union. We as the representative of the union. The reason that they brought it up was that they wanted quick identification of people. And, again, that would be the management of the maintenance center wanted quick identification of their employees because it's an additional restricted area where military equipment is worked on. And then the witness goes on to talk about how they already had the IDs for the larger base and they were concerned about having multiple aspects of employees. Sorry, multiple means of identification. And that's it. That's it. I don't think there's any doubt that they agreed that there ought to be a badge or a card. That's what they were discussing, the union and management. Should we have a card? Is there a reason for the card? And they all agreed ultimately there could be a card. The statute says whoever possesses a badge or other insignia of a design, the design prescribed by the head of any department or agency. Where does it say who, that the design was prescribed by somebody? Well, the design had to be prescribed by somebody in order for it to have gone into a badge. Oh, but by whom? By the head of the department or agency. And the design had to be prescribed by the head of the department or agency. Is there any evidence that the design was prescribed by anyone? Well, the district court judge, the evidence of the evidence of the evidence of the Well, I think it's what the district court judge relied on, which is this part of the testimony. It's a combination of the testimony about the structure of the base within the base, having its own head, the separate colonel, and the negotiations between union and management over the development of the badge, from which a reasonable inference can be drawn that management is the one dictating the details regarding this badge, including the fact that it must exist as well as its design. Okay. I'm just curious what's happening here. This is an interesting case, interesting prosecution. It's very interesting. Why would Jackson, or Mr. Jackson, have falsified a yellow badge on, I think it was March 2nd, 2011, when it's undisputed that he was issued a CAC badge that day? Well, I think, Your Honor, I think the defense's argument in that regard supposes a sequence of events that is not established by the record. So it's not at all clear from the record, and in fact, the defense's own exhibit, the sign-in sheet, indicates to the contrary, that the defendant was first refused that the defendant first obtained his CAC card, and then, despite the fact that he had the required identification, was then refused by Ashbrook the yellow card. In fact, the record demonstrates that the reverse is what happened. The defense admitted a sign-in sheet showing that the defendant went into manpower at the maintenance center on March 2nd at 930 in the morning, and Ashbrook's testimony establishes that he came in there looking for a yellow card. He did not at the time have the CAC card, and she refused to provide him with the yellow card. Then the record indicates that at some other point in time, and I would submit to you it's a reasonable inference that it was later in the day that he finally got his CAC card, and he only finally got his CAC card on March 2nd because the chief of police intervened and said, give him his card, even though he doesn't have the required two forms of identification. So that's the sequence of events that occurred on March 2nd. Now, why Mr. Jackson did not then, once he had his CAC card, why he did not then immediately run back to the maintenance center and get his yellow card, I don't know. A rational person would have behaved that way, but there's evidence in the record that indicates that perhaps Mr. Jackson did not behave as an otherwise rational person would have behaved, given the numerous times he lost his card, given the ---- Kennedy, he lost his card twice before. Your Honor, I believe that the record establishes he lost his card at least three times. Well, those of us who lose our cards from time to time. Let me ask you one other question about this. Are there any regulations governing this ---- governing these cards? Your Honor, I have to say I'm unaware of any regulations governing these cards. But if the Court is concerned with the language towards the end of the statute, except as authorized under regulations made pursuant to law, I think that refers to a different type of authorization. I think that provides an out, for example. Someone who is not an employee or who doesn't have a legitimate reason to possess this card may nonetheless be excused under existing Federal regulations. That's not what it says. It says whoever possesses these cards is violating the law, except as authorized under regulations. I mean, nobody can possess this card legally. It's what it's ---- Well ---- It seems to me that's what the statute says, that whoever does any of these things, including possession, except as authorized under regulations made pursuant to law, can be imprisoned for having the card. Except that the statute seems to contemplate that officers or employees of the agency may have them.  It says whoever sells or possesses these cards.    But it's not a statute that is authorized under regulations that are prescribed by the head of a department, except as authorized under regulations made pursuant to law. Your Honor, a logical reading of that, though, it can't ---- it cannot be that an act with notices and hearing requirements have to be prescribed just to issue badges to sensitive areas of military bases. It seems more likely that this section, authorized under regulations made pursuant to law, refers to, for example, sections of the Code of Federal Regulation that allow the commercial reproduction of badges or insignia. I'm not really suggesting we have to get to this reason to invalidate the conviction. I think we could stop with the first. But I guess, you know, maybe it's not worth it sometimes. With all the legal issues that get raised, you know, we could write an opinion that would cause a lot of problem with whether you need regulations for this. But, you know, who needs to do that? Yes, Your Honor. And if ---- I see my time is up. That's how I ---- you spend a lot of time on this case already on Mr. Jackson's $150. If ---- I suspect you're going to end up with a discharge case, too. If I may, yes. Just to give the Court context, one of the reasons that the record perhaps was not developed as my office would ordinarily develop the record in one of these cases is the unusual context in which it arises, which is as a Class B misdemeanor in a ticket sense, where essentially you show up and you can either contest your ticket or pay your ticket, and the proceedings are not handled by an assistant United States attorney. They're handled by a JAG officer, and they're somewhat informal, given the low stakes. So just to provide the Court with context as to a little bit of why we are where we are with our factual record here. Okay.  Thank you, Your Honor. Thank you very much. Counsel, did you get this case when you were in the public defender's office? I did, Your Honor. Have you left? I have. And you took the case with you? I took this case with me. It was a really exciting case. Well, you know, when you have an innocent client, it is quite exciting. And when you have – and I'll try to follow the Court's instructions to actually address the pertinent legal issue here. I think you all know there's – Well, you're almost out of time. Yes? I think Judge Newman said he was having trouble hearing you. I don't think there is much to add. I do think that it's clear that there are three requirements that were not met. One, that the maintenance center is a government agency. Two, that the card was of the design prescribed by the head of this agency. And third, that there were any regulations whatsoever governing the making of these badges. If the Court doesn't have that. Very good. That was a good argument. All right. Thank you. The case, this argument, will be submitted. I think the Court, being exhausted from the last argument, will take a brief recess before we hear the final argument of the morning. All rise. The Court is in recess. Are we ready for a post-argument comment? All right. Thank you.
judges: REINHARDT, NOONAN, MURGUIA